MARGARET L. HUFFMAN v JAMES A. CLICK and others.

*Evidence—Books on Inductive Sciences.*

1. Medical Works are not admissible in evidence " to show that the symptoms testified to by a witness were common in hysteria which is one of the exciting causes of paralysis." Nor is such evidence admissible to corroborate the professional opinion of a physician.

2 Where counsel proposed to read an extract from such work and adopt it as a part of his argument and the Court refused; *Held,* not to be error.

(The law of evidence excluding books upon " inductive sciences " and admitting those upon " exact sciences " discussed and explained by BYNUM, J.)

(*Melvin* v. *Easley,* 1 Jones 386, cited and approved.)

CIVIL ACTION for Damages tried at Spring Term, 1877, of ROWAN Superior Court, before KERR, J.

It appeared that there was a difficulty between the plaintiff and the defendant, Click, in regard to an injury to a valuable hog of the defendant, alleged to have been received while the hog was in a field cultivated by plaintiff. Click and the other defendants went to the plaintiff's house and demanded pay for the hog. Upon that occasion it was alleged that their manner and conduct so greatly frightened the plaintiff as to cause paralysis from which she suffered for three months. There was much evidence as to the cause of the disease which is sufficiently stated by Mr. Justice BYNUM in delivering the opinion of this Court.

Under the ruling of His Honor in the Court below the jury rendered a verdict for plaintiff. Judgment. Appeal by defendants.

*Mr. W. H. Bailey,* for plaintiff.
*Mr. J. M. McCorkle,* for defendants.

BYNUM, J.   The defendants say that the plaintiff was subject to hysteria which is an exciting cause of paralysis and in this case produced it without any default of theirs.   To show this, they introduced a witness who testified to certain "mad-fits " and crying spells of the plaintiff several years prior to the attack of paralysis.   They then introduced a physician who testified that he had heard all the evidence and from it was of opinion that the plaintiff was subject to hysteria, and that this disease was an exciting cause of paralysis.   He also testified that "Hammond's Work on the Diseases of the Nervous System" was a standard work with the medical profession.

In addressing the jury the counsel for the defendants insisted that the paralysis was caused by hysteria to which the plaintiff was subject.   He then proposed to read to the jury extracts from Hammond's Work "to show that the symptoms testified to by one of the witnesses were common in hysteria, and also for the purpose of showing that this disease was one of the exciting causes of paralysis."   The case also states that "the counsel did not propose to read the book as evidence but as a part of his argument."   His Honor refused to allow it to be read, stating that it was not admissible for any purpose.   The question is not whether the book was inadmissible for any purpose as stated by His Honor within the latter part of his ruling, but whether it was admissible for the purposes indicated by the defendants' counsel, to-wit ; "to show that the symptoms testified to by one of the witnesses were common in hysteria and that this latter disease was one of the exciting causes of paralysis."   How this could be done without making the book evidence of the truth of the facts contained in it, and also evidence to corroborate the professional opinion of the physician, it is hard to conceive.   In such works the argument is based upon the facts stated, and the argument and the facts are so blended that the counsel cannot well get the benefit of the one without the benefit of the other.

The physician on examination in this case had the right to refresh his knowledge by referring to standard works in his profession, but his evidence must be his own, independent of the works. He cannot read a medical work to the jury; how then can the counsel do it? If this practice were allowed many of our cases would soon come to be tried, not upon the sworn testimony of living witnesses, but upon publications not written under oath. But whether read as evidence or argument the work was inadmissible. The distinction between books that can and cannot be read is now pretty well defined and established.

It is only necessary now to draw so much of the line of distinction as is applicable in this case and excludes the book proposed to be read. If the work is read it must be to prove the truth of the facts contained in it and the justness of the conclusions which the author draws from those facts. But if medicine is a science (and it claims to be such) it belongs to that class called "inductive sciences." Such treatises are based on data constantly shifting with new discoveries and more accurate observation, so that what is considered a sound induction to-day becomes an unsound one to-morrow. The medical work which was "a standard" last year becomes obsolete this year. Even a second edition of the work of the same author is so changed by the subsequent discovery and grouping together of new facts, that what appeared to be a logical deduction in the first edition becomes an unsound one in the next. So that the same author at one period may be cited against himself at another. The authors of such works do not write under oath; the books themselves are therefore often speculative, sometimes mere compilations, the lowest form of secondary evidence; and as the authors cannot be examined under oath, the authorities on which they rely cannot be investigated, nor their process of reasoning be tested by cross examination. Such writings are nothing more or less than hearsay proof of that

which living witnesses could be produced to prove.   Wharton, Law of Evidence,§ 665.

The reasons however for rejecting medical works and others of the inductive class, do not apply to books of what are known as the "exact sciences," where the conclusions are reached from fixed, certain, and unvarying data partaking of the character of mathematical demonstration, and by process too abstruse to be explained or even understood in many cases by the witnesses.   It is unnecessary to say more of this class of books, as the book in question does not belong to it.

We have seen that Hammond's Work could not be read as substantive testimony and it was so held in the case of *Melvin* v. *Easley*, 1 Jones, 386.   Nor could it or any part of it be read as a part of the argument of counsel.   It sounds plausible to say, you do not read it as evidence, but that you read and adopt it as a part of your argument. But in so doing the counsel really obtains from it all the benefits of substantive evidence fortified by its "standard" character.   He first proves by the medical expert that the work is one of high character and authority in the profession, and then he says to the jury, "here is a book of high standing, written by one who has devoted his talents to the study and explanation of this special subject of nervous diseases.   He expresses my views with so much more force than I can, that I will read an extract from his work and adopt it as a part of my argument."   It is evident that the effect of this manœuvre is to corroborate the testimony of the medical expert or other witnesses by the authority of a great name testifying, but not under oath, to the same thing as the expert, but with this difference, that the author has not heard the evidence upon which the expert based his opinion.

The medical expert himself may cite standard authorities in this profession as sustaining his views, and then they may be

put in evidence by the opposing side to discredit him, but he cannot read them either as evidence or argument, nor can the counsel offering them.   1 Wharton on Ev. § 438, and §§ 665, 6, 7 ; *Commonwealth* v. *Wilson*, 1 Gray 337 ; *Ripon* v. *Bittle*, 30 Wis. 614; 12 Cush. 193; 1 Greenl on Ev. § 498, note.

There is no error.

