No. 13,572.

Graham *v.* The People.
(38 P. [2d] 87)

Decided October 29, 1934.

Mr. GAIL L. IRELAND, Mr. WM. WEISER, for plaintiff in error.

Mr. PAUL P. PROSSER, Attorney General, Mr. CHARLES H. QUEARY, for the people.

*En Banc.*

MR. JUSTICE BUTLER, sitting for MR. CHIEF JUSTICE ADAMS, delivered the opinion of the court.

CHARLES Eliga (Elijah) Graham was charged with the murder of Vina Glazier. He was found guilty of murder of the first degree and was sentenced to death. He seeks a reversal of the sentence.

The defendant being unable to employ an attorney, having no funds or property, the court appointed William Weiser, a member of the bar, to represent him. Upon arraignment, the defendant, by his attorney, pleaded not guilty by reason of insanity at the time of the alleged commission of the crime and since. There-

upon the court, Judge Logan presiding, committed the defendant to the Colorado State Hospital at Pueblo for observation, as provided in section 2, chapter 90, Session Laws of 1927, section 7121.2, Compiled Laws, 1932 Supplement. After having the defendant under observation for 20 days, Doctor Zimmerman, the superintendent of the hospital, reported to the court that the defendant was insane at the time of the examination and at the time of the alleged commission of the crime. The people did not subpoena Dr. Zimmerman; and as the hospital is not within the judicial district where the trial was held and is not within 100 miles of the place of trial, the court had no power to have the witness subpoenaed at the expense of the people. C. L. §7121; *Osborn and Noakes v. People,* 83 Colo. 4, 262 Pac. 892. The report of the doctor could not be introduced in evidence, and the defendant was unable to procure his attendance at the trial. The court, however, appointed three disinterested and capable physicians, Dr. B. L. Jefferson, Dr. E. H. Peterson and Dr. Frank J. McDonough, a commission to examine into the mental condition of the defendant. Dr. Jefferson is superintendent of the State Home for Mental Defectives, and has been giving his entire time to the treatment of mental defectives in that home. They reported that they examined the defendant on numerous occasions and found him to be dangerously insane.

██ ██    The people are not required in the first instance to offer proof of sanity, sanity being presumed in the absence of evidence tending to show the contrary. But when evidence is introduced tending to show insanity, the people have the burden of proving beyond a reasonable doubt the sanity of the defendant. Strictly speaking, the burden of proof does not shift. The defendant never has the burden of proving insanity. If, upon a consideration of all the evidence, the jury have a reasonable doubt whether the defendant was sane or insane at the time of committing the act they must find the defendant not guilty. *Pribble v. People,* 49 Colo. 210,

112 Pac. 220; *DeRinzie v. People,* 56 Colo. 249, 138 Pac. 1009; *Ingles v. People,* 92 Colo. 518, 22 P. (2d) 1109.

The people's evidence in chief was directed to the commission of the act and to the surrounding circumstances. The defendant called the three physicians constituting the commission appointed by the court. Each testified that the defendant was dangerously insane at the time of the homicide and at the time of the trial. The evidence in chief was not of a character to shed any light upon the mental condition of the defendant; and as he did not testify, the jury had no opportunity to form an opinion concerning his sanity, based upon his appearance and demeanor upon the witness stand and the coherence or incoherence of his testimony. His counsel say that they doubt the propriety of putting an insane person on the witness stand in any kind of case.

The people offered no evidence in rebuttal. If any evidence was obtainable, from either expert or non-expert witnesses, that would show or tend to show that the defendant was sane, it was the duty of counsel for the people to produce it; but no such evidence was offered, and in the circumstances its absence is significant. The strong showing of insanity made by the testimony of reputable disinterested and impartial physicians who were selected not by the defendant but by the court, was not met even by one word of testimony to the contrary. The verdict is incomprehensible, save upon the supposition that the brutal character of the killing so aroused the passion and prejudice of the jurors as to cause them to overlook or disregard the court's instructions.

When overruling the motion for a new trial and passing sentence, Judge Bruce, who presided at the trial, said among other things: "I cannot determine whether you are sane or insane; I have my own notion about it, but all I can do is to pronounce sentence as decreed by the jury after the trial in which you were very ably represented. * * * All I can do is to pronounce sentence as fixed by the jury, with the recommendation, which I

will incorporate in the order by separate letter or advice to the Governor. The reporter is taking down all I say, and it can go to the Governor with the recommendation that he appoint a commission to examine into your sanity and determine whether you are sane or insane, and if you are insane, the state has a way of taking care of you the rest of your life and if you are sane, it will be the duty of the state to take your life as a penalty.''

What the judge thought about the mental condition of the defendant is made clear in his letter to the Governor, referred to in his remarks, quoted above. The letter, dated March 22, this year, referred to Dr. Zimmerman's report and the report and testimony of the three physicians appointed by the court, and stated: ''Judge Straud M. Logan, who appointed Hon. William Weiser as counsel for the defendant, sometime prior to the beginning of the March term of court, also expresses as his opinion, without any qualification that the defendant, Charles Eliga Graham, is insane. I presume that he is; I think if I were called upon to testify from my observation and what I know about it, that this fellow Graham is insane. However, the jury found him sane and guilty of murder in the first degree and fixed the penalty of death and there was nothing else for the court to do except to pass sentence. * * * I advised the defendant that I would write a letter giving you the facts as I know them to be, for such action as you may take in the matter. In conclusion, I would urge that you give this matter your serious consideration in plenty of time so as to have the matter of his sanity tested prior to the date set for his execution, and if found to be insane, that such steps be taken by you as you may deem best.'' On May 22 he again wrote to the Governor, saying in part: ''I am very much concerned about this man Graham, and agree with Judge Logan who conducted the preliminary hearing and, on the recommendation of the District Attorney, sent Mr. Graham for observation to the psychopathic ward of the State Insane Asylum under Dr. Zim-

merman. After twenty days there Dr. Zimmerman pronounced Mr. Graham insane, that he was insane at the time the act was committed, is insane now, and never will be anything but insane. * * * The jury found him sane, notwithstanding we had a commission of three reputable physicians of Grand Junction who had examined him and pronounced him insane. * * * There was nothing else for me to do but sentence him, the death penalty having been fixed by the jury. This is the only case that I have had anything to do with where I felt not only justified but that it is my duty to recommend to you that you commute this man's sentence to life imprisonment and order that he be confined in the Insane Asylum at Pueblo.''

It appears, therefore, that at the time of pronouncing sentence the court was of the opinion that the defendant was insane when he committed the act. The court, however, thought that it had no power to interfere with the verdict; that, on the contrary, it was its duty to sentence the defendant to death. In this the court was in error. A court never should sentence a person to death unless its reason and judgment approve the verdict. Unless the court is satisfied with the verdict to that extent, it is its clear duty to set aside the verdict and grant a new trial. We so held in *Piel v. People,* 52 Colo. 1, 119 Pac. 687. In that case the trial court, in denying the defendant's motion in arrest of judgment, stated: ''I have no pardoning power; clemency does not rest with me, it rests with the governor. The jury has convicted this man and found him guilty of murder in the first degree. This is not a strong case. I have known of stronger cases where the defendant has gone scott free. I have tried murder cases in this district stronger than this where the man was acquitted; but that does not matter. There is evidence upon which to base this verdict.'' The court sentenced the defendant to death. We reversed the sentence, saying in part: ''No one can read the record before us without being impelled to the belief

that the verdict is manifestly against the weight of the evidence. A doubt will certainly arise regarding the justice of such verdict, as it evidently did in the mind of the trial judge giving rise to his language hereinbefore quoted. In a case of this character, not only should the jury be convinced beyond a reasonable doubt before agreeing upon such a verdict, and fixing the penalty at death, but the trial court should likewise entertain a firm belief in the justness of the verdict before pronouncing judgment. Moreover, this court must be very certain that the verdict and judgment are justified by the weight of the evidence before we can sanction the infliction of the penalty here imposed." See also *Morletti v. People,* 72 Colo. 7, 209 Pac. 796; *Lowe v. People,* 76 Colo. 603, 234 Pac. 169.

While a refusal to grant a new trial ordinarily indicates that the court's conscience and reason approve the verdict (*Bowen v. People,* 87 Colo. 38, 40, 284 Pac. 779), no such presumption exists in the present case, for here the record shows clearly that the conscience and reason of the court did not approve the verdict.

In support of the defendant's application to this court to stay execution and permit the defendant to prosecute his writ of error as a poor person, there were presented a certificate by Dr. Eichelberger, assistant managing officer of the Alton State Hospital in Illinois, addressed to whom it may concern, stating that Charles Graham was admitted to that institution on June 25, 1920, and escaped therefrom almost immediately; and a letter from the deputy district attorney at Salida, Colorado, addressed to the Governor, stating that the defendant lived in and around Salida for about a year; that he was in the writer's office many times; that they had considerable trouble with him because of his threatening people; and that he was and is insane—"crazy." That certificate and that letter, however, are not part of the record we are reviewing, and we are not at liberty to give them any weight.

■ Our statute provides that, "A lunatic or insane person without lucid intervals shall not be found guilty of any crime or misdemeanor with which he may be charged; Provided, The act so charged as criminal shall have been committed in the condition of insanity." C. L. §6637. No matter how brutal a homicide may be, a person who is insane at the time of committing it cannot lawfully be found guilty of murder, but, under section 4, chapter 90, Session Laws of 1927, section 7121.4, C. L., 1932 Supplement, must be confined in the Colorado State Hospital at Pueblo under the laws governing that institution.

The judgment is reversed, and the cause is remanded to the district court for a new trial.

Mr. Chief Justice Adams did not participate.